IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| ASHLEY BARRASSO, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 17-0267 |
| | ) | |
| CHILDREN'S HOSPITAL OF PITTSBURGH | ) | |
| OF UPMC, *et al.* | ) | |
| Defendants. | ) | |

## OPINION

Presently pending before the Court is a motion for summary judgment (ECF No. 52), with brief in support (ECF No. 53), filed by Children's Hospital of Pittsburgh of UPMC (hereinafter referred to as "CHP"), Kenneth Rudek (Rudek), and Heather Ambrose (Ambrose), collectively, "Defendants". Plaintiff Ashley Barrasso (Barrasso) has filed a brief in opposition (ECF No. 60). Defendants have filed a reply brief (ECF No. 68) and Barrasso has filed a sur-reply brief (ECF No. 75). For the reasons that follow, the Court will grant in part and deny in part Defendants' motion.


**Factual History**[1]

Barrasso, now an adult, is a survivor of childhood cancer. Barrasso was treated at CHP. She has not been treated for cancer since 2000, although she continues to suffer from multiple health issues stemming from her illness, including abdominal pain, digestive issues, heart palpitations and fatigue.

---

[1] The facts outlined herein are gleaned from Defendants' Concise Statement of Material Facts (ECF No. 54), Barasso's response and statement of additional facts (ECF Nos. 58, 59), and Defendants' response (ECF No. 69), as well as the various exhibits attached thereto.

From September of 2009 until her discharge on August 5, 2016, Barrasso was employed by CHP, first as a Child Life Assistant, and later as a Child Life Specialist.[2] Barrasso was the only Child Life Specialist in Unit 8B, CHP's inpatient gastrointestinal and pulmonology unit. Ambrose, the Director of Nursing, was Barrasso's direct supervisor from July of 2013 until August 5, 2016. Rudek, the Manager of Child Life Services, supervised Barrasso from December of 2014 until he left CHP on July 22, 2016.[3]

<u>Barrasso's FMLA Leave</u>

Due to her on-going health issues, WorkPartners, CHP's third-party FMLA administrator, approved Barrasso for annual intermittent FMLA leave. Barrasso sought and was approved for intermittent leave each year, beginning in 2013. The amount of approved leave varied year to year. The CHP FMLA Policy states that an employee seeking to use his or her intermittent FMLA leave must follow the applicable department call-off procedures (ECF No. 55-2, Ex. 14, ¶ F).

At the time of Barrasso's employment with CHP, the Child Life Department had a call-off procedure which required each employee to notify his or her manager of an intended absence thirty minutes before the start of his or her shift. However, according to Barrasso, in order to accommodate her FMLA requirements, she and management "had come up with a supplemental call-off plan that was different than the department call-off plan," (ECF No. 55-2, pg. 25, 27), where she had the leniency to "call in all the way up until [her] scheduled start time and if it happened to be a little after, just to call in as soon as possible and whether that was notifying [her]

_____

[2] According to Barasso, a Child Life Specialist "provide[s] psycho-social support for patients and their families, prepare[s] them for [medical] procedures, engage[s] in play therapy, normalize[s] the hospital experience and assist[s] with stress management" (ECF No. 53, pg. 1-2).

[3] In the hospital hierarchy, Rudek reported to Ambrose.

coverage person and/or the manager" (Id. at pg. 53-54). Rudek and Ambrose dispute the existence of this supplemental call-off policy (ECF No. 55-1, pg. 366; ECF No. 55-6, pg. 258-60).

At a staff meeting on January 14, 2016, all Child Life employees, including Barrasso, were made aware of the Department's general call-off policy (ECF No. 55-1, pg. 365). A copy of the policy was made available online for employees to view (ECF No. 55-6, pg. 94, 96). In addition, Ambrose and Rudek met with Barrasso to review the policy on January 14, 2016, due to her repeated "unexcused tardiness episodes and absenteeism that violated the policy" (Id. at 367; ECF No. 55-6, pg. 258-60). At that meeting, Rudek explained that Barrasso was subject to the department-wide call-off policy and instructed her to comply with it going forward (ECF No. 55-6, pg. 260-61). Rudek provided her with a hard copy of the policy (Id.) The meeting between Rudek, Ambrose, and Barrasso was memorialized in an email from Rudek to Jenelle Taylor (Taylor), a senior human resources consultant with CHP (ECF No. 62-3, Ex. 132).

In March of 2016, Barrasso's yearly FMLA leave allowance was increased. This led to an email exchange between Ambrose and Rudek wherein both voiced concerns about how Barrasso's FMLA leave time was impacting the Department and affecting the patients in unit 8B (ECF No. 69, ¶¶ 79, 81-82).

On March 8, 2016, Barrasso sent an email at 9:10 a.m. informing Rudek and others that she would be taking an FMLA leave day (ECF No. 55-6, pg. 265). Because her scheduled shift was to begin at 9:00 a.m., Barrasso's notice failed to conform with the call-off policy (Id. at 266). In his response to her email, Rudek reminded Barrasso of the call-off policy (ECF No. 55-6, Ex. G).

On March 31, 2016, Rudek issued Barrasso a verbal warning which was reduced to writing as a "corrective action," and stated, in relevant part, as follows.

<u>Current issue</u>.
You have failed to follow proper call off on the following days: 2/23/16, 2/24/16,
2/25/16, 2/29/16, 3/17/16, 3/24/16, and 3/28/16.

In addition, you called off on 3/17/16, and 3/18/16 without PTO time available.

<u>Corrective Action /Policy [V]iolation/Value Statement</u>.
As a result you are receiving a verbal warning, your actions are in violation of CHP
Attendance and Corrective Action policy 140, in accordance with Child Life
Department scheduling guidelines.

Failure to adhere CHP Attendance and Correction Policy, and Child Life
Scheduling and Attendance guidelines or violation of any UPMC, Children's or
department policy shall result in further corrective action, up to and including
termination of employment.

(ECF No., 55-2, Ex. 16).

Barrasso's employment with the Department, her compensation, and her leave time were
not affected by this memorandum, and she continued to use her FMLA-leave after the memo was
issued.

<u>Camp Inspire and Barrasso's Termination</u>

In July of 2016, CHP held its annual Camp Inspire, a summer camp experience for children
with respiratory issues. Three Child Life employees, Barrasso, Shannon Scalise, and Becky
Desmond, were assigned to the Camp and jointly planned and prepared camper activities for the
week. Barrasso was scheduled to work Sunday through Thursday of Camp week. According to
Ambrose, Child Life Specialists working at Camp were expected to "work with their department
leader to request … the days and hours to attend camp" which is then approved by a manager (ECF
No. 70-2, pg. 148). Actual worked hours are reported to supervisors and physically entered into
the payroll database by a supervisor at the end of Camp week before the Monday payroll deadline
(<u>Id</u>. at 148-49).

On Sunday, July 17, 2016, Barrasso sent Scalise a text message at 11:08 A.M. informing Scalise that she was taking a sick day. Barrasso did not inform her manager of the sick leave day, nor did she designate this as an FMLA day. Later that evening, Barrasso texted Scalise to tell her she would be late to Camp on Monday.

On Monday, July 18, 2016, Barrasso arrived at Camp before 11:00 a.m. and worked until 5:30 p.m.

On Tuesday, July 19, 2016, Barrasso arrived at Camp at 10:00 a.m.

On Wednesday, July 20, 2016, Barrasso worked at Camp until 12:00 or 12:30 p.m. when she left, allegedly to go shopping for graduation supplies for a camper. Although Child Life employees were permitted to shop for Camp, they were required to request permission before doing so. Barrasso neither requested, nor was granted, permission. Barrasso did not return to Camp that evening because of her commitment that week to teach in the afternoon at a skating camp at Robert Morris University.

On Thursday, July 21, 2016, Barrasso arrived at Camp at 11:00 a.m. She missed the scavenger hunt she was assigned to organize. Barrasso had sent a text message to Scalise that morning that stated "Hey sorry my alarm never went off and I over slept" (ECF No. 55-8, pg. 102, Ex. 67). However, during her deposition, Barrasso alleged that she spent the morning shopping for graduation items and scavenger hunt prizes (ECF No. 55-2, pg. 72).

Barrasso was not scheduled to work on Friday, July 22, 2016, and did not attend Camp. Barrasso indicated that she intended to use Friday as a "swap day" for Sunday (ECF No. 55-8, pg. 102).

On Friday, July 22, 2016, Scalise met with Rudek to discuss Barrasso's absences, her rude behavior toward staff and campers at Camp Inspire, and the statements that she made about not

working on Friday (ECF No. 55-8, pgs. 76, 77-78, 107). Scalise also met with Ambrose (Id. at pgs. 157-158, 214). Independently, Desmond, the other Child Life Specialist at Camp Inspire, also met with Rudek and Ambrose on July 22, 2016 regarding Barrasso's behavior during the previous week (ECF No. 55-4, pg. 47-58).

As a result of these meetings, Rudek emailed Barrasso to ask her to confirm that she worked at Camp Inspire Sunday through Thursday, with Friday as a swap day.[4] Barrasso responded in the affirmative (ECF No. 55-2, Ex. 19). Later that day, Ambrose likewise asked Barrasso to confirm her hours for the week. In response, Barrasso emailed, "Sure thing. I know I received an email earlier today from [Rudek] regarding this as well. I worked 8:30·4:30 pm most of those days, I think one of two days was more like 8-4" (ECF No. 55-2, Ex. 18).

On July 26, 2016, at the request of CHP human resources, Ambrose met with Barrasso regarding the discrepancies between Scalise's and Desmond's reports and Barrasso's purported hours worked (ECF No. 55-1, pg. 239-44). During that meeting, Ambrose compared the hours Barrasso claimed she worked in emails with Rudek and Ambrose to the text messages provided by Scalise and Desmond (Id.) In particular, Ambrose noted that Barrasso did not follow the department's call-off procedure, did not prepare for or attend her assigned Camp event, and expressly told Rudek and Ambrose that she worked on Sunday, despite evidence to the contrary (Id. at pg. 240). Ambrose also noted that Barrasso was unclear as to whether Sunday was supposed to be an FMLA day (Id.) That afternoon, Barrasso sent an email to Ambrose blaming the "oversight" in her hours on "a long week" and memory issues associated with her illness (ECF No. 55-2, Ex. 20). However, following these discussions, Ambrose and human resources decided to terminate Barrasso's employment, effective July 29, 2016. The reason given for termination

---

[4] Rudek's last day with CHP was July 22, 2016.

was dishonesty, specifically repeated falsification of her worked hours at Camp. Barrasso was informed of her discharge on August 5, 2016.

<u>Exhaustion of Administrative Remedies</u>

On August 8, 2016, Barrasso filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC).[5] On August 11, 2016, Barrasso filed a grievance to challenge her termination, which was denied on September 1, 2016 (ECF No. 55-2, Ex. 25). On October 17, 2016, she filed an amended charge adding a claim of retaliation and a claim of discharge in violation of the Americans with Disabilities Act (<u>Id</u>. at Ex. 27). On April 7, 2017, the EEOC issued a Right to Sue Notice.

**Procedural History**

Barrasso initiated this action by filing a complaint on March 3, 2017, raising claims pursuant to the Rehabilitation Act, 29 U.S.C. § 701, *et seq.* and the Family Medical Leave Act (FMLA), 29 U.S.C. § 2617 (ECF No. 1). Defendants filed an answer (ECF No. 6), after which Barrasso filed an amended complaint, which added claims pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.* (ECF No. 11). On June 6, 2017, Defendants answered the amended complaint (ECF No. 14). Following discovery, on July 9, 2018, Defendants filed a motion for summary judgment (ECF No. 52). The motion has been fully briefed and is ripe for disposition. This Court has jurisdiction under 28 U.S.C. § 1331.

---

[5] The record indicates that Barrasso signed the form on August 3, 2016 and it was stamped as received by the EEOC on August 8, 2016 (ECF No. 55-2, Ex. 26).

**Standard of Review**

Rule 56(a) of the Federal Rules of Civil Procedure provides that:

> [a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed.R.Civ.P. 56(a).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). For the purposes of summary judgment, "[a] material fact is '[a] fact[ ] that might affect the outcome of the suit under the governing law.'" Haybarger v. Laurence Cnty. Adult Prob. & Parole, 667 F.3d 408, 412 (3d Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." (Id.) (quoting Anderson, 477 U.S. at 248-49).

In resolving a motion for summary judgment, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

**Discussion**

1. Barrasso's Claims of Disability Discrimination

In Count I of her amended complaint, Barrasso alleges that she was "subjected to adverse employment actions, including daily harassment, limits to opportunities for professional growth and development, negative performance evaluations, and termination" on the basis of her disability in violation of Section 504 of the Rehabilitation Act (ECF No. 11 ¶¶ 57-64). Count V of her amended complaint raises similar allegations, couched as violations of the ADA (Id. ¶¶ 99-105).

The Third Circuit has explained that "[w]hether suit is filed under the Rehabilitation Act or under the [Americans with] Disabilities Act, the substantive standards for determining liability are the same." McDonald v. Commonwealth of Pennsylvania, 62 F.3d 92, 95 (3d Cir. 1995); 29 U.S.C. § 794(d). Accordingly, the familiar framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793-94 (1973), is applicable.

> Under the McDonnell Douglas burden shifting paradigm, plaintiff has the initial burden to make a *prima facie* showing of discrimination, but if s/he does so, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment action. If the defendant meets this burden, the presumption of discriminatory action raised by the *prima facie* case is rebutted. However, the plaintiff must then be afforded an opportunity to show that the employer's stated reason for the employment action, such as plaintiff's rejection or separation, was pretextual. In order to prove the employer's explanation is pretextual, the plaintiff must cast [ ] sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication ... or ... allow[ ] the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. A plaintiff who has made out a *prima facie* case may defeat a motion for summary judgment by either (i) discrediting the employer's proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

Wishkin v. Potter, 476 F.3d 180, 184–85 (3d Cir. 2007) (citations and quotation marks omitted).

To state a *prima facie* case under either statute, Barrasso must establish the following:

1. she has a disability;

2.  she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and

3.  she nonetheless suffered an adverse employment action as a result of discrimination.

See Donahue v. Consol. Rail Corp., 224 F.3d 226, 229 (3d Cir. 2000); Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996).

Barrasso alleges that her disability is cancer and that she was qualified for her position as a Child Life Specialist, points that Defendants concede. However, Defendants contend that she is unable to meet the third prong of the above test because she was not subjected to an adverse employment action as a result of her disability (ECF No. 53, pgs. 11-14).

### a.  *Adverse Employment Action Under the ADA*

Barrasso alleges that she suffered the following adverse employment actions that entitle her to relief: (1) limitation to opportunities for professional growth and development, (2) negative performance evaluations, (3) the March 2016 warning, and (4) termination (ECF No. 11, ¶¶ 60-62; ECF No 60, pg. 5). The Third Circuit has described an adverse employment action "as an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Jones v. SE. Pa. Transp. Auth., 796 F.3d 323, 326 (3d Cir. 2015) (citations omitted).

### 1.  Opportunities for Professional Growth and Development

Barrasso alleges that, as a result of her disability, she was passed over for a Child Life Specialist position with CHP's Cardiac and Thoracic Unit "despite the fact that she had more experience with the particular population and unit within the Hospital than the successful

applicant" (ECF No. 55-2, pg. 31-34).[6] However, Barrasso admits that this position was not a promotion and did not result in a pay raise (Id. at 35). Accordingly, the record does not support a finding that denying Barrasso the lateral move to a different unit was "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment" such that it would constitute an adverse employment action. See Remp v. Alcon Laboratories, Inc., 01 Fed.Appx 103 (3d Cir. 2017) (holding that a failure to grant an employee a lateral move that involved neither a promotion nor a pay increase did not constitute an adverse employment action).

2. Negative Performance Evaluations

Barrasso's work performance was evaluated on a yearly basis. From 2011 through 2015, Barrasso was rated as a "solid, strong, good performer" (ECF No. 69, ¶¶ 8, 10, 15, 21, 43, 45). However, Barrasso points out that her evaluations also included criticism of her absences. For example, in 2014, Ambrose noted that Barrasso "voices flexibility and helpfulness within the department but is often unable to follow through due to unplanned absence" (Id. at ¶ 26). In 2015, Rudek ranked Barrasso as a marginal performer in three subsections of her evaluation due to her "failure to call off in a timely manner" (Id. at ¶¶ 43, 45). In the "Responsibilities" section, Rudek wrote that "[i]t was also noted by peers and staff that not calling off in a timely fashion often results in her unit being uncovered" (Id. at ¶ 46). Nonetheless, the 2015 evaluation entitled Barrasso to a merit-based pay increase, although the amount was less than it would have been if Barrasso had received a higher ranking (Id. at ¶ 44).

---

[6] According to Rudek, the Child Life Department, selected another Child Life Specialist to make the lateral move who had previously worked on the Cardiac and Thoracic Unit, and who was recommended by the out-going employee. (ECF No. 55-6, pgs. 85-86, 283-84).

"As explained by another district court within the Third Circuit, [t]o constitute an adverse employment action, the negative performance review must tangibly alter the terms and conditions of employment. Thus, the mere allegation that a negative evaluation took the employee off track for promotion and formed a basis for denying him opportunities is too conjectural to be actionable." (Rossiter v. Costello, No. CIV.A. 11-1183, 2012 WL 3235149, at *9 (E.D. Pa. Aug. 9, 2012) (citing Foster v. Ashcroft, 2006 WL 1995305, at *2 (D.N.J. July 14, 2006) (quoting Turner v. Gonzales, 421 F.3d 688, 696 (8th Cir. 2005)); see also Cashman v. CNA Fin. Corp., 2012 WL 113667, at *12 (E.D. Pa. Jan.13, 2012) ("A negative performance review and being placed on a performance improvement plan, without more, is not an adverse employment action.").  It is hard to discern how the 2011-2014 performance evaluations could be deemed negative so as to constitute adverse employment actions.  Further, even if the 2015 evaluation could be considered an adverse employment action, the criticism lodged against Barrasso stems from her inability to adhere to the Department's call-off policy, not her disability.  Accordingly, even when viewed in the light most favorable to Barrasso, the evidence fails to support a *prima facie* case of discrimination. Donahue, 224 F.3d at 229.


### 3.  The March 2016 Warning

On March 31, 2016, Rudek issued a memo to Barrasso memorializing the verbal warning given regarding Barrasso's failure to utilize proper call-off procedure in February and March of 2016 (ECF No. 55-2, Ex. 16).  Although the memo provides that corrective action may be taken for further violations, as Taylor explained in her deposition, a verbal warning does not result in change of title, loss of benefits, pay reduction, demotion, suspension, or a limit an employee's ability transfer between units or apply for other positions at CHP (ECF No. 55-9, pg. 146-47).

Moreover, as above, the violation at issue was related to Barrasso's failure to comply with the call-off policy, not her disability. As such, even when viewed in the light most favorable to Barrasso, the evidence fails to support that the memo constitutes an adverse employment action. See Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001), overruled in part on other grounds by, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006) (written reprimands did not constitute adverse employment action sufficient to support a retaliation claim).

4. Termination

The parties agree that termination, in and of itself is, an adverse employment action. Accordingly, the Court agrees that Barrasso has made a *prima facie* case of discrimination on this basis. The burden now shifts to the Defendants to articulate some legitimate, non-discriminatory reason for Barrasso's termination. Wishkin 476 F.3d at 184–85. In this regard, Defendants argue that Barrasso was discharged for dishonesty, specifically for falsely reporting the hours she worked during Camp Inspire, and repeating those falsehoods until confronted with contradicting evidence (ECF No. 53, pg. 15-18).

Barrasso contends that this justification is pretextual, arguing that "a genuine dispute of material fact exists because [the] evidence shows it was an inadvertent failure to properly report time or report absence," brought on by "the extreme exhaustion and fatigue she felt from a long week at Camp" combined with "excruciating pain" from her illness (ECF No. 60, pg. 13). Further, Barrasso alleges that Ambrose's course of action when faced with inconsistencies about Barrasso's working hours was an attempt to "use [her] honest mistake as a pretext to discharge" by emailing Barrasso while she was sick and forcing her to "confirm that she had worked a full week, effectively trying to trap her into a failure to properly report time and absence" (Id.) She argues

that Scalise and Desmond were subject to more relaxed work requirements with respect to their own reporting dishonesty and contends that Ambrose could have adjusted Barrasso's pay retroactively to prevent overpayment and the fact that she was paid in full is evidence of pretext (Id. at 16-17). Finally, Barrasso alleges that comments made by Rudek at the March 31, 2016 meeting and in an April 7, 2018 email demonstrate a causal connection between her disability and her termination (Id. at 12-13).

The parties agree that, under the corrective action policy for CHP, dishonesty is a basis for immediate termination (ECF No. 70-2, pg. 386). Additionally, although Barrasso alleges that Camp week 2016 was the first time she had been asked to account for her hours, the record demonstrates that she had received counseling with respect to the Department's call-off procedure for months prior to her termination. Moreover, other Child Life Specialists testified that they had been expected to report their Camp hours to management in past years (ECF No. 55-8, pg. 55-56). Further, Ambrose sent the exact same email to Barrasso, Scalise, and Desmond, asking them to clarify their hours (ECF No. 55-1, pg. 284).

In her deposition, Barrasso admits that she made "oversights" with regard to her hours, and failed to report to Ambrose or Rudek that there were days of Camp week she missed entirely and days she came late and/or left early (ECF No. 55-2, pgs. 75-77, 78-80). Although she disputes the weight given to her dishonesty (and whether that dishonesty was intentional), in order discredit the employer's proffered reason, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (citations omitted). Thus, the fact that Ambrose chose to disbelieve Barrasso's statements regarding the misrepresentation of her worked hours

does not demonstrate that CHP acted out of discriminatory animus in terminating Barrasso's employment.

Moreover, the record does not bear out Barrasso's claims that Scalise and Desmond were dishonest. Barrasso claims that Scalise must have been dishonest in reporting that she arrived at Camp by 10:30 a.m. because she lives approximately 20 minutes from Camp Inspire and sent a text at 10:19 a.m. in which she said that she was leaving her house (ECF No. 60, pg. 16). In her deposition, Scalise could not recall what time she sent the text message at issue and indicated that she sometimes forgot to send messages until she was halfway to her destination (ECF No 55-8, pg. 150). Based on these facts, any dishonesty alleged is pure speculation. The issue involving Desmond, whether she was paid for eight hours when she actually worked six, involves no allegation that Desmond misreported her hours, but instead whether those hours were recorded correctly. Again, any allegation of dishonesty on the part of Desmond is purely speculative. Further, Barrasso's retroactive pay argument involves payroll, not dishonesty and seemingly, impacted Desmond in the exact same way it did Barrasso: both were knowingly overpaid. Neither situation suggests that Ambrose's stated reason for discharge was pretextual.

Finally, the facts fail to support Barrasso's argument regarding an alleged causal connection between Rudek's statements and her discharge. As discussed in more detail below, even in the light most favorable to Barrasso, the alleged frustrations of management were unrelated to her disability, but rather focused on her use of leave time and failure to utilize the proper procedure to call off. Additionally, this Court notes that Rudek did not play a role in Barrasso's termination as he had resigned by the time that decision was made.

Accordingly, Barrasso has failed to establish that that discrimination on the basis of her disability was more likely than not a motivating or determinative cause of any adverse employment action and this claim fails.

### b. *Hostile Work Environment*

In addition to the claims outlined above, Barrasso maintains that she was subjected to "daily harassment" on the basis of her disability. Assuming, *arguendo*, that Barrasso is claiming that she was subjected to a hostile work environment[7], she must prove the following: (1) she is a qualified individual with a disability under the ADA; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) that the Defendants knew or should have known of the harassment and failed to take prompt effective remedial action. Walton v. Mental Health Ass'n. of Southeastern Pennsylvania, 168 F.3d 661, 667 (3d Cir.1999)). To establish a *prima facie* case, Barrasso bears the burden of proving that these actions were "sufficiently severe or pervasive to alter the conditions of [her] employment and to create an abusive working environment." Walton, 168 F.3d at 667. "To judge whether such an environment is hostile or abusive, we must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (citations omitted).

---

[7] The Court is mindful that the Third Circuit has not recognized a cause of action for hostile work environment under the ADA. See Barclay v. Amtrak, 240 F. App'x 505, 508 (3d Cir. 2007) (citing Walton v. Mental Health Ass'n. of Southeastern Pennsylvania, 168 F.3d 661, 667 (3d Cir.1999)).

In her amended complaint, Barrasso claims that Rudek harassed her by issuing a verbal warning on March 31, 2016, by using her accommodation "against her in the terms and conditions of her employment;" and by "interfering with her work performance" (ECF No. 11, ¶¶ 32-35, 41, 44). In her brief in opposition to Defendants' motion for summary judgment, Barrasso asserts that she "suffered antagonism" and that her disability was blamed for staffing issues in the Child Life Department (ECF No. 60, pgs. 24-25).

As outlined above, written reprimands did not constitute adverse employment action sufficient to support a retaliation claim. Weston, 251 F.3d at 431. Again, with respect to the other allegations about Rudek, even viewing the record in the light most favorable to Barasso, this Court cannot agree that the alleged harassment was related to her disability. Further, Barrasso's vague claim of "antagonism" is unsupported by evidence of record. See Taylor v. Cherry Hill Bd. of Educ., 85 Fed. Appx. 836, 839 (3d Cir. 2004) (holding that, in the context of employment discrimination claims, "conclusory allegations of discrimination, in the absence of particulars, are insufficient to defeat summary judgment"); Fed. R. Civ. P. 56(c) (explaining that this Court is only bound to consider facts that are supported by citation to "particular parts of materials in the record"). Finally, the evidence is clear that the alleged staffing complaints were based on Barrasso's leave time and inability to call off per the Department's guidelines. Accordingly, the Court cannot agree that the alleged harassment was sufficiently severe or pervasive to alter the conditions of her work environment such that it would support Barrasso's claim of a hostile work environment.

2.  Barrasso's Claims of Retaliation Under the Rehabilitation Act and the ADA

In Counts II and VI of her amended complaint, Barrasso alleges that Defendants retaliated against her in violation of the Rehabilitation Act and the ADA. As with claims of discrimination, Section 504 of the Rehabilitation Act incorporates the substantive standards of ADA with respect to retaliation.[8] "To establish a *prima facie* case of retaliation under the [Rehabilitation Act], a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 498 (3d Cir. 1997).

Here, Barrasso alleges that her protected activities are (1) her "requested accommodation for her disability in the form of leave from work" and (2) the formal charge she filed with the EEOC (ECF No. 11, ¶¶ 73-74). She alleges that she was subjected to adverse employment actions, "including daily harassment, limits to opportunities for professional growth and development, negative performance evaluations, and termination" (Id. at 75).

With respect to the latter allegation, the evidence of record belies any causal connection between Barrasso's formal charge of disability discrimination and her discharge, particularly in light of the fact that the charge was not received by the EEOC until August 8, 2016, after her termination. Barrasso admitted in her deposition that she did not tell anyone at CHP that she had filed a charge and had no reason to believe that her employer knew she intended to make a filing (ECF No. 55-2, pg. 85).

---

[8] Section 503(a) of the ADA provides that: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

With respect to her first allegation, it is well-settled that requesting an accommodation is a protected employee activity under the ADA. Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 191 (3d Cir. 2003). Additionally, the record demonstrates that Barrasso suffered an adverse employment action, termination, after her accommodation was granted and her leave time increased in March of 2016. Accordingly, Barrasso bears the burden of proving a causal connection between the employee's protected activity and the employer's adverse action.

"[I]n the ADA retaliation context … temporal proximity between the protected activity and the termination [can be itself] sufficient to establish a causal link. However, the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004) (citations omitted).

The record indicates that over 5 months passed between the increase in Barasso's FMLA leave and her termination. This Court cannot agree that the temporal proximity here is unduly suggestive. See Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (finding two days unduly suggestive); Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 283 (6th Cir. 2012) (three weeks); Wierman v. Casey's Gen. Stores, 638 F.3d 984, 994 (8th Cir. 2011) (four days); cf. McCann v. Tillman, 526 F.3d 1370, 1376 (11th Cir. 2008) (five days in Title VII retaliation case)). However, "in cases like this one, where the temporal proximity is not so close as to be unduly suggestive, [the Third Circuit has] recognized that timing plus other evidence may be an appropriate test...." Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (quoting Estate of Smith v. Marasco, 318 F.3d 497, 513 (3d Cir. 2003) (internal quotation marks omitted)).

In this case, Barrasso has set forth enough evidence to support her contention that a reasonable trier of fact could conclude that she was terminated based on her exercise of her right

to her allotted, increased FMLA leave. To reiterate: in March of 2016, Barrasso's FMLA leave allotment was increased. On March 15, 2016, Rudek forwarded the FMLA approval notice to Ambrose, and suggested that, due to the increase in leave, he would need to "find another option for [Barrasso] than a unit assignment. Missing two days per week on the unit has resulted in inadequate child life service to the patients on 8B" (ECF No. 69, ¶ 79). Ambrose agreed, noting in her response to Rudek's email that "[t]his is not a role that cannot continue to support her call offs" and, acknowledging that Departmental downsizing had resulted in coverage issues which were exacerbated by Barrasso's absences, suggested creating a part-time position for Barrasso and hiring another Child Life Specialist for unit 8B (Id. at ¶¶ 81, 82). Neither alternative was ever enacted.

On March 31, 2016, Rudek issued the corrective action memo to Barrasso. On April 7, 2018, Rudek made a comment to Ambrose questioning the propriety of Barrasso's home situation vis-à-vis her health (ECF No. 55-1, pg. 424). On April 10, 2016, in her email to Rudek, Barrasso disputed her discipline and asked that the corrective action memo be removed from her file (ECF No. 69, ¶¶ 113-14). Rudek indicated that he was unable to do so (Id. at ¶ 113).

From April until her discharge in August of 2016, Barrasso took at least 7 FMLA leave days (ECF No. 55-6, pg. 138). The week leading up to Camp, Barrasso missed several days of work on intermittent FMLA leave including the Friday before the start of Camp. (ECF No 55-2, pg. 64). The only FMLA-related day off that Barrasso took during Camp week was Sunday July 17, 2016 (ECF No. 69, ¶ 153). After meeting with Barrasso, Ambrose decided to terminate her employment. Rudek was no longer working for CHP at the time. On Wednesday, July 27, 2016, in an email exchange, two representatives from HR handling the termination paperwork, commented that Ambrose "indicated that she has struggled with attendance issues with [Ms.

Barrasso] for years," and Ms. Barrasso "does have 2 approved intermittent FMLA leaves" (Id. at ¶ 161). On August 5, 2016, Ms. Barrasso was informed of her termination in a meeting with Paula Eiker, a Senior Director at CHP (Id. at ¶ 168).

In particular, the emails between Rudek, Ambrose, and, later, human resources in the months leading up to her termination, when construed in Barrasso's favor, are sufficient to create an inference that the decision to terminate Barrasso was influenced by her FMLA-related absences. See Farrell, supra. Because she has set forth a *prima facie* case, this Court must consider the legitimate non-discriminatory reason proffered by Defendants for Barrasso's termination. "To defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. To do so, she "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [CHP's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" (Id. at 765).

Here, there is enough contradictory evidence that could lead a reasonable factfinder to conclude that Ambrose's stated reason for Barrasso's termination was pretextual. Accordingly, Barrasso has met her burden at this stage of the litigation, and her claims of retaliation Under the ADA and the Rehabilitation Act will survive summary judgment.


3. Barrasso's FMLA Claims

a. *Interference*

In Count III of her amended complaint, Barrasso argues that Defendants interfered with her rights under the FMLA by "subjecting her to adverse employment action, including, but not limited to, a negative performance review and her ultimate termination" (ECF No. 11, ¶ 87).

The FMLA provides that "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the Act. 29 U.S.C.A. § 2615(a)(1).

To make a claim of interference under the FMLA, a plaintiff must establish:

> (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

Ross v. Gilhuly, 755 F.3d 185, 191–92 (3d Cir. 2014) (citation omitted). "Under an interference claim, the employee need not show that he was treated differently than others[, and] the employer cannot justify its actions by establishing a legitimate business purpose for its decision. Also, [b]ecause the FMLA [interference claim] is not about discrimination, a McDonnell Douglas burden-shifting analysis is not required." (Id.) (citations omitted).

There is no dispute that Barrasso meets the first three requirements of the test outlined in Ross. Defendants argue that her claim fails because she cannot establish the fifth prong, citing to Barrasso's deposition testimony wherein she admitted that she was approved by WorkPartners each time she applied for FMLA leave, that she actually took the leave allotted to her, and that she was never refused an FMLA request (ECF No. 53, pg. 20-21). Barrasso counters by arguing that Ambrose and Rudek discouraged her from taking smaller leave increments in violation of 29 C.F.R. § 825.205(a)(1) (ECF No. 60, pg. 9). The Regulation provides, in relevant part, as follows

> (1) When an employee takes FMLA leave on an intermittent or reduced leave schedule basis, the employer must account for the leave using an increment no greater than the shortest period of time that the employer uses to account for use of other forms of leave provided that it is not greater than one hour and provided further that an employee's FMLA leave entitlement may not be reduced by more than the amount of leave actually taken. An employer may not require an employee to take more leave than is necessary to address the circumstances that precipitated the need for the leave, provided that the leave is counted using the shortest increment of leave used to account for any other type of leave.

29 C.F.R. § 825.205(a)(1).

The parties agree that "[e]mployees on intermittent leave … are allowed to take FMLA leave in increments as small as one hour up to a full day, and if the employee is feeling sick in the morning and feels better he or she is allowed to come to work later in the day" (ECF No. 69, ¶ 65). In an email chain after the January 15, 2016 meeting with Barrasso, Rudek informed Taylor, *inter alia*, that

> [Barrasso] was told that if she was unable to be present for the start of her shifts she should notify her manager prior to the scheduled start time that she would not be in and explain why she was calling off – whether it was related to her disability or due to illness or some other reason. [Barrasso] contemplated this and verbally agreed to comply with this policy. She remarked that if she felt better later in the day she would come to work and asked to be assigned work duties.

(ECF No. 62-3, Ex. 132, pg. 4).

Taylor asked "how was the thought ended when she said she wanted to come in late?" (Id. at pg. 3). Rudek responded

> I reminded her that on the occasions that she has said she would be in late, she seldom if ever, made it in. We told her that the expectation was to be at her shift start; she agreed to call off if unable to report for her start. If she did come in later in the day, the time missed would be coded to FMLA and if coverage was needed in the department she would be assigned to cover it. The expectation is that she be there for her assigned unit and there isn't a guarantee that if she came in later there would be a need.

(Id. at pg. 2). Taylor then questioned whether Rudek "even wanted her to come in late after she mentioned she needs to come in late due to her medical condition given her past behavior of not coming in at all" (Id.) Rudek replied

> Tough call. I guess the thinking is trying to be understanding of her medical condition and giving her opportunity. Really would be surprised if she ever comes in late. She was essentially trying to say that her condition can change. I've not seen evidence. Other staff either call off or come in. The policy really doesn't address this, (the opportunity for staff to come in late if feeling better)[.]

(Id.)

Barrasso was not a recipient of these emails. However, when viewed in the light most favorable to her, this exchange supports her contention that she was discouraged from coming in to work later in the day if she was feeling better. In fact, a reasonable jury could find that she was specifically underlined encouraged to take her FMLA time in full day allotments in violation of 29 C.F.R. § 825.205(a)(1), particularly because the Department's call-off policy was directly opposed to the Regulation. Accordingly, because she has supported with competent evidence her allegation that she was discouraged from taking a minimal amount of FMLA leave, her interference claim survives summary judgment. See F.R.C.P. 56(c), (e).


a. *Retaliation*

Finally, Count IV of the amended complaint raises a claim of retaliation under the FMLA. Similar to her retaliation claims brought pursuant to the Rehabilitation Act and the ADA,

> [t]o prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights. Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law. Accordingly, claims based on circumstantial evidence have been assessed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

(1973), while claims based on direct evidence have been assessed under the mixed-motive framework set forth in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 276–77, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring).

<u>Lichtenstein v. Univ. of Pittsburgh Med. Ctr</u>., 691 F.3d 294, 301–02 (3d Cir. 2012) (some citations omitted).

Because the analysis for this claim is the same as that for Counts II and VI above, it will not be restated here. For the reasons previously discussed, Barasso has met her burden with regard to this claim and Defendants' motion will be denied with regard to Count IV.


**<u>Conclusion</u>**

Here, as set forth above, there is no genuine dispute as to any material fact with respect to Counts I and V of the amended complaint. Accordingly, this Court will grant Defendants' motion for summary judgment (ECF No. 52), as to those two counts. <u>See</u> Fed.R.Civ.P. 56(a).

Further, as there is a genuine dispute of material fact with respect to Barasso's claim of retaliation under the Rehabilitation Act, Count II; FMLA interference, Count III; FMLA retaliation, Count IV; and ADA retaliation, Count VI; Defendants' motion is denied with respect to those Counts.

An appropriate order follows.

DATED this 28th day of January, 2019.

BY THE COURT:


s/ Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


ASHLEY BARRASSO,                    )
                   Plaintiff,      )
                             )
   vs.                      )      Civil Action No. 17-0267
                             )
CHILDREN'S HOSPITAL OF PITTSBURGH   )
OF UPMC, *et al.*               )
                 Defendants.     )

## ORDER

AND NOW, this 28th day of January, 2019, for the reasons stated in the Opinion filed contemporaneously herewith, it is hereby ORDERED that the Defendants' Motion for Summary Judgment (ECF No. 52) be and the same hereby is GRANTED as to Count I, Disability Discrimination pursuant to the Rehabilitation Act, and Count V, Disability Discrimination pursuant to the ADA, of the amended complaint (ECF No. 11).

The motion is DENIED with respect to the remaining four Counts.

/s/ Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Cc: record counsel via CM-ECF